# IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | |
|---|---|
| STEPHEN MOYER, Administrator<br>of the Estate of Charlotte J. Finck<br>9 East Kossuth Street<br>Columbus, Ohio 43206, | Case No.: 19 CV 007808<br><br>Judge Richard Frye |
| SARAH POPOVICH<br>1040 ████ock Burn Drive<br>Colu████ Ohio 43235, | **JURY DEMAND<br>ENDORSED HEREON** |
| CHARLES POPOVICH<br>1040 ████ck Burn Drive<br>Colu████ Ohio 43235, | |
| CHARLES POPOVICH, as Parent and<br>Natural Guardian of WESLEY POPOVICH<br>1040 ████ck Burn Drive<br>Colu████ Ohio 43235, | |
| CHARLES POPOVICH, as parent and<br>Natural Guardian of WILLIAM POPOVICH<br>1040 ████ck Burn Drive<br>Colu████ Ohio 43235, | |
|        Plaintiffs, | |
|   v. | |
| SIMBAD LLC<br>c/o Bakhtiyar Khasrat, Statutory Agent<br>6105 Buttonbush Street<br>Tipp City, Ohio 45371, | |
| BAKHADIR KUZIKOV<br>36 Baltimore Street<br>Dayton, Ohio 45404, | |
| GREATWIDE DALLAS MAVIS LLC<br>c/o CT Corporation System Philadelphia<br>2001 Market Street, 5th Fl.<br>Philadelphia, PA 19103 | |
|        Defendants. | |

1

EXHIBIT A

## FIRST AMENDED COMPLAINT

Steven Moyer, Administrator of the Estate of Charlotte Fink, as well as Sarah Popovich and Charles Popovich, individually and as parent and natural guardian of Wesley Popovich and William Popovich (collectively "Plaintiffs") for their First Amended Complaint against Simbad LLC ("Simbad"), Bakhadir Kuzikov ("Kuzikov"), and Greatwide Dallas Mavis, LLC ("Greatwide") state:

## INTRODUCTION

1.        This First Amended Complaint asserts claims for wrongful death, serious and permanent personal injury, and loss of consortium resulting from a tractor-trailer that exited the freeway, drove down the exit ramp with the cruise control set at 58 mph, and never stopped before crashing into a vehicle stopped at the red light at the end of the exit ramp.  Charlotte Fink was a passenger in that vehicle and died later that day at the hospital.  Charlotte's adult granddaughter, Sarah Popovich, was in the driver's seat and sustained significant, permanent and life changing injuries and damages.

2.        Police dash-cam video captured the crash (see https://youtu.be/ywFcIsxSi8w). Downloaded data from the tractor-trailer confirmed the driver's reckless conduct.  This case is about more than just the cash that day.  This case also is about how and why the dangerous truck driver was permitted to be driving a tractor trailer in the State of Ohio.  All of the Defendants engaged in conduct demonstrating a reckless disregard for the rights and safety of motorists in the State of Ohio, which directly caused this dangerous driver to be driving the tractor trailer that caused the crash.

## PARTIES JURISDICTION AND VENUE

3.        At the time of the crash, Decedent Charlotte Fink was a resident of Franklin County, Ohio.

4.     At the time of the crash, Plaintiffs Sarah Popovich, Charles Popovich, Wesley Popovich and William Popovich were all residents of Franklin County, Ohio.

5.     At the time of the crash, Defendant Simbad LLC was a limited liability company formed under the laws of the State of Ohio with a principal place of business in Montgomery County, Ohio.

6.     At the time of the crash, Bakhadir Kuzikov was a resident of Montgomery County, Ohio.

7.     At the time of the crash, Greatwide Dallas Mavis, LLC was a limited liability company formed under the laws of the State of Delaware with its principal place of business in Langhorne, Pennsylvania.

8.     This Court has jurisdiction over this matter because the crash occurred in Franklin County, Ohio and some Defendants are residents of the State of Ohio.

9.     Venue is proper in this Court pursuant to Civil Rule 3(C) (3) (6) and (7).

## FACTS

10.     Non-party Alton Steel, Inc. is a steel manufacturer based in Alton, Illinois.

11.     Alton Steel manufactures various steel products including steel coils, bars and/or rods. Alton Steel transports its products and property to locations throughout the country using tractor-trailers. Under the substantive law in this case, Alton Steel is known as a "Shipper."

12.     In March 2019, Alton Steel had 40,000 pounds of steel rods that needed to be transported from its plant in Alton, Illinois to a customer in Painesville, Ohio.

13.     The transportation route from Alton, Illinois to Painesville, Ohio is financially undesirable for several reasons including that it is very unlikely the Motor Carrier will find another load near Painesville for the return trip. As a result, when the shipment is delivered to Painesville, Ohio, the Motor Carrier will lose time and fuel to return an empty tractor trailer to its

3

home base.  A Motor Carrier will lose even more money transporting this shipment if the Motor Carrier must drive an empty tractor trailer to Alton, Illinois to pick up the shipment.

**Greatwide Agreed To Be The Motor Carrier For This Shipment.**

14.     Defendant Greatwide Dallas Mavis, LLC ("Greatwide") is registered as a Motor Carrier (DOT572641-MC277164) and holds itself out as an interstate Motor Carrier for the transportation of goods in interstate commerce.

15.     Prior to the transportation of this shipment, Alton Steel entered into a contract with Greatwide entitled Contract Carrier Transportation Service Agreement (Greatwide Motor Carrier Agreement).  Attached as Exhibit A is a copy of the Greatwide Motor Carrier Agreement.

16.     The Greatwide Motor Carrier Agreement contains specific agreements between Alton Steel and Defendant Greatwide including Greatwide warranting that all transportation of Alton Steel's property shall be in compliance with State and Federal law and Greatwide "shall be liable as an interstate motor carrier for the safe transportation of all property."  See Exhibit A (Greatwide Motor Carrier Agreement).

17.     Defendant Greatwide accepted the shipment from Alton Steel.  Greatwide was authorized to transport, agreed to transport and was legally bound to transport the Alton Steel shipment in interstate commerce from Alton, Illinois to Painesville, Ohio.

18.     After Defendant Greatwide agreed to transport this shipment, a Bill of Lading was issued for the shipment.  The Bill of Lading identifies Greatwide as the Motor Carrier.  There is no broker identified on the Bill of Lading.   See Exhibit B (Bill of Lading).

19.     However, Defendant Greatwide did not transport the shipment it agreed to transport for Alton Steel.

4

### Greatwide Used An Internet Load Board To Find A Dangerous Sub-Carrier.

20.    Defendant Greatwide accepted the shipment from Alton Steel and was legally and contractually obligated to safely transport Alton Steel's shipment.

21.    Because the Alton Steel shipment was not financially lucrative, Defendant Greatwide wanted to have someone else transport the shipment.

22.    Finding a sub-carrier to transport the financially undesirable load allowed Defendant Greatwide to maximize profits by using its trucks and its drivers to only transport Alton Steel's financially desirable routes, but passing off the financially undesirable routes to any sub-carrier that would take them.

23.    Defendant Greatwide posting this shipment on a shipping internet load board known as Truckstop.com.  Shipping internet load boards are similar to Craigslist or eBay, but limited to the transportation industry.   Companies who have a shipment that needs to be transported can list the shipment.  Companies or drivers looking to transport loads will search the site and accept shipments to transport.

24.    Based upon Defendant Greatwide's listing on Truckstop.com, Defendant Simbad LLC selected Greatwide's Alton Steel shipment.  As a result, Greatwide employed Simbad and its driver, Defendant Bakhadir Kuzikov, to be a driver, sub-carrier and/or statutory employee for this shipment that Greatwide was legally and contractually obligated to transport for Alton Steel.

### Simbad Recklessly Hired Kuzikov Who Was A Dangerous And Reckless Driver.

25.    Defendant Simbad, LLC is a registered Motor Carrier (DOT23099427-MC791528) located in Montgomery County, Ohio and is owned and operated by Bakhtiyar Khasratov.

26.    On February 21, 2019, a little over a month before the crash, Defendant Bakhadir Kuzikov applied to be a truck driver for Simbad.

5

27. Prior to hiring a truck driver, a Motor Carrier like Defendant Simbad is required by law and industry standards to conduct a reasonable investigation of the applicant. At a minimum, a company like Simbad must contact prior employers and inquire about the applicant's driving history, accidents, traffic tickets as well as the driver's drug/alcohol use or testing. When Kuzikov applied to be a driver at Simbad, he signed a form authorizing his prior employers to disclose this type of information to Simbad.

28. Defendant Simbad never contacted Defendant Kuzikov's prior employers to obtain information about his driving history or drug/alcohol use or testing.

29. Prior to hiring a truck driver, a Motor Carrier like Defendant Simbad is required by law and industry standard to make inquiry with every State in which the driver has held a motor vehicle operator's license for the preceding three years to check on the driving history. When Defendant Kuzikov applied to be a driver, Kuzikov signed a form for Simbad to obtain this information from State agencies.

30. Defendant Simbad never made inquiry with the Ohio BMV or any other State where Defendant Kuzikov held a driver's license.

31. Prior to hiring a truck driver, a Motor Carrier like Defendant Simbad is required by law and industry standard to ask a prospective driver whether they tested positive or refused to be tested for drugs or alcohol. Defendant Kuzikov signed a form on February 21, 2019, but Simbad never required Kuzikov to answer whether he had tested positive or refused to be tested.

32. If Defendant Simbad would have used reasonable care, followed industry standards and complied with regulatory mandates to investigate Defendant Kuzikov's driving records, Simbad would have learned:

- Kuzikov caused a tractor trailer hit/run crash on October 22, 2018 in Hamilton County, Ohio (5 months prior to this crash).

6

- Kuzikov received a ticket for driving in marked lanes in Hamilton County, Ohio on October 22, 2018.

- Kuzikov received a ticket in Utah for unsafe lane change on February 16, 2018.

- Kuzikov received another ticket in Utah for failure to signal on February 13, 2018 (3 days earlier).

- Kuzikov's caused a tractor-trailer crash on October 24, 2017 in Montgomery County, Ohio (18 months prior to this crash).

- Kuzikov received a ticket in Dayton, Ohio for disregard of safety on October 24, 2017.

- Kuzikov received a ticket in Alabama for failure to signal on March 15, 2012.

- Kuzikov received a ticket in the City of Elyria, Ohio for speed (86 mph/ 65 mph zone) on September 29, 2008.

33.     If Defendant Simbad would have used reasonable care, followed industry standards and complied with regulatory mandates to investigate Defendant Kuzikov's prior employment, Simbad would have learned:

- Kuzikov was terminated from his last employer, Vita Nova LLC, after working as a tractor-trailer driver for only 7 months.

- Kuzikov's employer prior to Vita Nova was Izmir Koch, who operated a trucking company out of Huber Heights, Ohio. Koch is wanted by the FBI and is believed to have fled to Russia. Koch's Ohio address (534 Baltimore St) is less than 900 yards from Kuzikov's Ohio address (36 Baltimore St) in Dayton, Ohio.

- Kuzikov's employer before Izmir Koch was Specialized Solutions LLC, operated by Anvar Akhmedov. Mr. Akhmedov operated three prior trucking companies, each of which were closed for safety violations.

34. Tractor-trailers, when fully loaded, can weigh as much as 80,000 pounds. Driving tractor-trailers is dangerous and can cause severe and catastrophic injury or death unless skillfully and carefully done. Reasonable care must be used when employing a Motor Carrier or driver.

35. Because of the inherent dangers of tractor-trailers to the motoring public, the Federal government requires all interstate trucking companies to be licensed and registered.

36. In an effort to increase public safety, the U.S. Department of Transportation, through the Federal Motor Carrier Safety Administration (FMCSA), issues the public authority to operate an interstate trucking company.

37. In an effort to increase safety of the public, and assist in using reasonable care when employing a Motor Carrier or driver, the FMCSA maintains publicly available data on websites, which contain safety information for all registered Motor Carriers. One of the FMCSA websites is the SAFER website (Safety And Fitness Electronic Records). The SAFER website exists so users of the transportation industry can hire trucking companies that operate safely and can avoid hiring trucking companies that are unsafe.

38. The FMCSA also maintains publicly available data on a website known as the Safety Measurement System ("SMS"), which uses data from tractor-trailer roadside inspections and crash reports to collect information about Motor Carriers under different categories known in the transportation industry as BASIC categories (Behavior Analysis & Safety Improvement Categories).

39. In addition to publicly available data from government websites, private risk management websites exist to help users of transportation industry to exercise reasonable care in selecting safe Motor Carriers and drivers. Private websites like SaferWatch.com provide safety

information and safety ratings about Motor Carriers so users of Motor Carriers can avoid unsafe

or dangerous Motor Carriers, and hire those Motor Carriers that safely operate.

**Greatwide Recklessly Knew or Chose Not To Know Simbad Was Dangerous.**

40.     At or around the time when Defendant Greatwide employed Defendant Simbad to

be a sub-carrier to transport the load Greatwide agreed to transport for Alton Steel, SAFER data

showed the national average of Out of Service violations for all truck drivers throughout the

country was 5.51%, but Simbad drivers had Out of Service violations of 11.3%, more than

double the national average.  In the transportation industry, this is a significant "red flag"

indicating Simbad does not employ safe drivers, does not require drivers to focus on safety

and/or does not train or monitor the safety of its drivers.

41.     At or around the time when Defendant Greatwide selected Defendant Simbad to

be a sub-carrier and transport the Alton Steel load for Greatwide, the BASIC data from SMS

showed Simbad had 23 Hours of Service compliance violations in 24 months, including repeated

violations for failure to maintain a record of driver's duty hours; driving beyond the 8 hour limit;

and driving over 70 hours in an 8 day period.  All of these violations are serious safety

violations.  In the transportation industry, this data is a significant "red flag" indicating Simbad

does not employ safe drivers, does not require drivers to focus on safety and/or does not train or

monitor the safety of its drivers.

42.     At or around the time when Defendant Greatwide selected Defendant Simbad to

be a sub-carrier and transport the Alton Steel load for Greatwide, information from government

websites was available showing specific data regarding Simbad's dangerous and reckless driving

history.  As of March 13, 2019 (two weeks before Greatwide selected Simbad as its sub-carrier),

the FMCSA data indicated Simbad drivers received eight unsafe driving violations in the

preceding 12 months including speed, using hand held mobile device, failure to obey traffic

control devices and inattentive driving. These are serious safety violations in the trucking industry and amount to a significant number of serious safety violations in 12 months, especially since Simbad only had 11 drivers.

43.     At or around the time when Defendant Greatwide selected Defendant Simbad to be a sub-carrier and transport the Alton Steel load for Greatwide, information available from government websites revealed Simbad had five serious accidents in the preceding 12 month period. In the trucking industry, that is an alarming amount of serious accidents in a 12 month period, especially for a company that only has 11 drivers.

44.     At or around the time when Defendant Greatwide selected Defendant Simbad to be a sub-carrier and transport the Alton Steel load for Greatwide, a cursory review of data available from private websites like SaferWatch.com, showed Simbad had an "Unacceptable" rating for safety and Simbad's overall rating on SaferWatch.com was "Unacceptable."



45.     An "Unacceptable" rating for safety on SaferWatch.com is a serious "red flag" in the transportation industry indicating a Motor Carrier is not safe.

46.     Before Defendant Greatwide employed Defendant Simbad and Defendant Kuzikov to transport its load, substantial information was available to Greatwide in public databases, on the internet and in private transportation industry databases that made it clear

Simbad and Kuzikov had an unacceptable, reckless and dangerous safety record. However, Greatwide still allowed Simbad and Kuzikov to transport the shipment that Greatwide agreed to transport, and was legally obligated to transport, for Alton Steel.

### Fake Russian CDL Schools & Unsafe Russian Trucking Companies Were Well Known To The Transportation Industry By This Time.

47.     Defendant Greatwide had other reasons to be suspicious of and to investigate the safety background of Defendant Simbad and Defendant Kuzikov.

48.     Several years prior to this crash, unsafe and fraudulent truck driving schools started to appear in the United States. These fraudulent companies frequently were created by individuals from Eastern European countries like Russia, Uzbekistan and/or Moldavia. Some individuals operating these entities are suspected to be connected with Russian organized crime.

49.     These fraudulent truck driving schools recruited Russian speaking men from Eastern European countries to come to America, or solicited Russian speaking men who were already in America, to attend their truck driving schools and obtain a Commercial Driver License (CDL). The fraudulent truck driving schools often advertised on the Internet or in Russian chat rooms, using names like www.russiantruckingschool.com.

50.     In exchange for the "tuition" fee of a few thousand dollars, these fraudulent truck driving schools often would create fake documents for their students to present at State licensing agencies. Since most States allow private companies to administer CDL driving tests, the fraudulent driving schools were able to create fake documents purporting to certify the student passed the CDL driver test.

51.     Many students at these fraudulent truck driving schools could not read or speak basic English even though trucking regulations require truck drivers to be able to read and communicate in English.

11

52. After a fraudulent CDL was obtained, individuals often were hired by Russian owned trucking companies, with very little knowledge, training or ability to safely operate a tractor-trailer. These companies often ignored State and Federal safety regulations and often induced their truck drivers to cut corners on safety or paid drivers such small amounts for each trip that drivers were forced by the unrealistic economic pressure to violate traffic laws and safety regulations to make ends meet.

53. These unsafe Russian trucking companies often generated dismal safety records and would be shut down by the FMCSA or State regulatory agencies. The owners often would create a new trucking company name and obtain a new DOT number. The new trucking company would continue operating with the same unsafe business practices. Within the transportation industry, unsafe trucking companies that change names and obtain new DOT numbers are known as "chameleon carriers."

54. According to a 2012 report from the US Government Accountability Office (GAO) entitled "Motor Carrier Safety – New Applicant Reviews Should Expand to Identify Freight Carriers Evading Detection," new applicants for DOT numbers that had chameleon attributes, were three times more likely than all other new applicant carriers to be involved in a severe crash involving injuries or fatality. The same report indicated the numbers of chameleon carriers increased from 759 in 2005, to 1,136 in 2010. See "Motor Carrier Safety – New Applicant Reviews Should Expand to Identify Freight Carriers Evading Detection," located at https://www.gao.gov/products/GAO-12-364.

55. The existence of fraudulent Russian trucking schools, unsafe Russian trucking companies and/or chameleon carriers were well known in the transportation industry by 2011.

56. In December 2011, the United States Department of Justice issued a press release announcing the indictment of Vitaliy Kroshnev and Tatyana Kroshnev, who helped Russian

12

speaking individuals to fraudulently obtain CDLs in Pennsylvania. Part of the scheme involved employing corrupt translators to help Russian speaking applicants pass the written portion of the CDL test. See Exhibit C ("Pennsylvania Husband and Wife Sentenced to Prison for Fraudulent Commercial Driver's License ███████████████████████ t of Justice (Dec. 23, 2011)).

57.     In July 2015, the United States Department of Justice issued a press release announcing the indictment of Ellariy Medvednik, Natalia Dontsova and other individuals involved with a Florida fraudulent truck driving school. These individuals operated a company known as Larex, which marketed its services on the Internet to Russian speaking individuals. The scheme had individuals travel to Florida, submit fake documents to establish residency in Florida and fraudulently obtain a Florida driver's license. Then, using covert communication equipment, Larex employees provided answers for the written portion of the CDL exam. At least 600 fraudulent CDLs were issued. See Exhibit D ("Illegal Commercial Driver License Conspiracy Exposed," Press Release, US Department of Justice (July 6, 2015)).

58.     In May 2018, The Office of Inspector General for the US Department of Transportation issued a press release advising that Aziz Akhrorov plead guilty to conspiring to unlawfully produce CDLs. Akhrorov recruited New York based CDL applicants, usually of Russian descent, and referred them to Tara Chabanovych in Florida, who helped the applicants fraudulently obtain documents to establish bogus residency in Florida. They used sophisticated video and audio devices concealed on the applicants to provide answers to the CDL exam questions while the applicants were taking the test. See Exhibit E ("New York Commercial Truck Driver Pleads Guilty To Participating in CDL Testing Fraud Scheme in Florida and New York," Press Release, Office of Inspector General, US Dept of Transportation (May 10, 2018)).

59. The existence of fraudulent Russian truck driving school and dangerous Russian Motor Carriers was covered by the mainstream media as well as by trucking and transportation publications.

60. By February 2019, when Defendant Simbad hired Defendant Kuzikov, and by March 2019 when Defendant Greatwide selected Simbad and Kuzikov as a sub-carrier to transport the Alton Steel shipment for Greatwide, the dangers of fake Russian CDL schools and dangerous Russian trucking companies were well known to Greatwide, Simbad and others in the transportation industry.

61. When it hired Defendant Kuzikov in February 2019, Defendant Simbad knew Defendant Kuzikov was unable to functionally speak or read English. Prior to hiring Kuzikov, Simbad knew, or recklessly chose not to know, that Kuzikov had an unsafe driving record; that Kuzikov's previous employer, Specialized Solutions, LLC, operated a Russian chameleon trucking company in Michigan; and that Kuzikov's other prior employer, Ismir Koch, was a Russian national who operated a trucking company out of Montgomery County, Ohio and is an international fugitive wanted by the FBI. With only a brief Internet background search, Simbad and Greatwide would have known, and should have known, Kuzikov was an unsafe truck driver.

62. When Defendant Greatwide selected Defendant Simbad and Defendant Kuzikov to be its sub-carrier and driver in March 2019 to transport the Alton Steel shipment, Greatwide knew, or recklessly chose not to know, about the unsafe and hazardous practice of fraudulent CDLs being issued to Russian or Eastern European truckdrivers as well as the unsafe and hazardous practice of Russian or Eastern European trucking companies that hired unsafe and unqualified truck drivers.

63. Defendant Greatwide knew, or recklessly chose not to know about the data and information from SAFER, SMS and/or SaferWatch.com revealing Defendant Simbad was owned

14

and operated by Bakhtiyar Khasrat; that Simbad's drivers had a dismal safety rating with violations almost twice the national average; Simbad's drivers were involved in at least five serious accidents in the previous 12 months; and that Defendant Kuzikov had a history of tractor-trailer accidents and traffic citations in Ohio and other states.

### At Freeway Speeds, Kuzikov Crashed Into A Stopped Vehicle At End Of Exit Ramp.

64      On March 25, 2019, Defendant Kuzikov obtained the load from Alton Steel in Alton, Illinois.

65.      On March 26, 2019, Defendant Kuzikov was in the course and scope of his employment with Defendant Simbad while transporting the shipment in the State of Ohio.

66.      Defendant Kuzikov drove the tractor and trailer registered to Defendant Simbad with 40,000 pounds of steel northbound on Interstate 270, in Franklin County, Ohio. Kuzikov had the cruise control set at 58 mph.

67.      Defendant Kuzikov decided to exit Interstate 270 in Hilliard, Ohio. When Kuzikov started down the freeway exit ramp at the Fishinger Boulevard exit, the cruise control was still set at 58 mph.

68.      As Defendant Kuzikov continued down the freeway exit ramp, the cruise control remained set at 58 mph.

69.      As Defendant Kuzikov approached cars stopped for the red light at the end of the exit ramp, the cruise control remained set at 58 mph.

70.      About two seconds before impact, Defendant Kuzikov first attempted to apply the brakes.

71.      Defendant Kuzikov crashed his fully loaded tractor-trailer into a vehicle lawfully stopped at the red light. That vehicle was occupied by Sarah Popovich and her grandmother Charlotte Finck.

72.   The enormous impact from the 80,000 pound, fully loaded tractor-trailer traveling at freeway speeds, transferred significant loads to Plaintiffs' stopped vehicle, forcing the vehicle to be propelled through the intersection, over a divided median, across the opposite lanes of travel and into the grass area beyond the northbound freeway entrance ramp for Interstate 270.

73.   As a direct and proximate result of the significant impact, Charlotte Fink sustained substantial injuries, pain and suffering as well as property damage.  She was transported to the hospital by ambulance, but died later that day from her injuries.

74.   As a direct and proximate result of the significant impact, Sarah Popovich sustained significant and catastrophic injuries, has suffered and will suffer permanent and substantial physical deformities for the rest of her life; has not and will not be able to return to her profession; has lost the ability to engage in activities of daily living; and has suffered other substantial harms and losses.

75.   Soon after crashing Simbad's loaded tractor-trailer at high speed into the stopped vehicle, killing Charlotte Fink and catastrophically injuring Sarah Popovich, Defendant Kuzikov fled the United States and is believed to be in Uzbekistan or neighboring Eastern European countries.

76.   Defendant Kuzikov was indicted by a Franklin County grand jury for felony aggravated vehicular homicide.  Upon information and belief, the United States Attorney's Office and United States Marshall have issued an international fugitive warrant for Kuzikov's arrest.

## FIRST CLAIM
### (Negligence/Negligence *Per Se*/Vicarious Liability -- Kuzikov & Simbad)

77.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully rewritten herein.

78.     Plaintiff Sarah Popovich was lawfully operating a vehicle on a public roadway and was lawfully stopped at a red light at the end of the exit ramp. Sarah's grandmother, Charlotte Finck, was in the front passenger seat.

79.     Defendant Kuzikov had a common law and statutory duty to safely and lawfully operate the tractor-trailer, slow the tractor-trailer to a safe speed while exiting the freeway, to maintain an assured clear distance ahead and to take other reasonable steps and/or follow other laws or regulations to safely operate the tractor-trailer.

80.     Defendant Kuzikov was an employee, agent, leased driver and/or servant of Defendant Simbad and was acting within the course and scope of his employment with Simbad. Under the common law principals of *respondeat superior*, as well as agency principals, Simbad is vicariously liable for Kuzikov's conduct.

81.     As a direct and proximate result of Defendant Kuzikov and Defendant Simbad's negligence, negligence *per se* and/or reckless conduct, Charlotte Finck sustained significant damage to her personal property, suffered conscious pain and suffering, was severely injured and later died. The Estate of Charlotte Finck hereby brings a wrongful death and survivorship claim on behalf of the Estate and all beneficiaries and next of kin for all damages available under Ohio law for those claims.

82.     As a direct and proximate result of Defendant Kuzikov and Defendant Simbad's negligence, negligence *per se* and/or reckless conduct, Sarah Popovich sustained significant, catastrophic and permanent injuries. These injuries caused a significant loss of consortium for her husband, Charles Popovich, and their children Wesley and William.

83.     The conduct of Defendant Kuzikov and Defendant Simbad, both vicariously and directly, demonstrated a reckless disregard for the rights and safety of the motorists of Ohio, including Charlotte Finck and Sarah Popovich. Kuzikov and Simbad's conduct demonstrates

17

malice, aggravated and egregious fraud.  Further, Simbad knowingly authorized, participated in and ratified the conduct, actions and omissions of Kuzikov.

## SECOND CLAIM
### (Negligence/Recklessness/Direct Liability -- Simbad)

84.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if fully recited herein.

85.     The 2015 Volvo Tractor and the 2019 Fontaine trailer involved in the crash constituted a Commercial Motor Vehicle operated by and under the direct control of Defendant Kuzikov, but was owned and/or leased by and under the control of Defendant Simbad, and was being used on behalf of and for the benefit of Simbad.

86.     The operation, maintenance, and control of the tractor-trailer combination was governed, licensed, supervised, and regulated by State and Federal government agencies, and as such was operated pursuant to a certificate of authority given to Defendant Simbad to operate such vehicles and to carry goods for hire in interstate commerce by the FMCSA and/or other government regulatory bodies.

87.     Defendant Simbad is a Motor Carrier licensed under Federal and State law and was required to comply with all safety regulations relating to driver selection, driver training, safe operating rules, and vehicle inspections.

88.     Defendant Kuzikov was not properly skilled or qualified to operate the subject tractor-trailer.  That lack of skill and knowledge was known or should have been known by Defendant Simbad.  The FMCSA regulations and industry custom and practice required Defendant Simbad to use reasonable care and, at the very minimum, check on Defendant Kuzikov's driving history and prior employment.  Defendant Simbad negligently failed to comply with these minimum background checks before hiring Defendant Kuzikov.  Defendant

Simbad negligently failed to apply the most basic hiring and retention procedures in a way that would have resulted in the decision not to hire and/or retain Defendant Kuzikov as a driver and to not provide a tractor-trailer to him. Instead, Defendant Simbad recklessly failed to apply any hiring and/or retention criteria, and Simbad knew or should have known that Defendant Kuzikov had an unsafe and dangerous driving history. Defendant Simbad's negligent and/or reckless hiring and retention conduct was a direct and proximate cause of Plaintiffs' catastrophic injuries and wrongful death.

89.     Defendant Simbad also was negligent and/or reckless in hiring, training, supervising, dispatching, route management, route planning, and/or retaining Defendant Kuzikov as a tractor-trailer driver. Defendant Simbad's failure to comply with safety regulations resulted in the creation of a known danger and hazard to the traveling public. Defendant Simbad's negligent and/or reckless conduct was a direct and proximate cause of the catastrophic injuries and wrongful death, for which Plaintiffs are entitled to recover damages to be proven at trial.

90.     As a direct and proximate result of Defendant Simbad's reckless failure to use reasonable care, various breaches of regulatory duties, negligent and reckless conduct, Defendant Simbad is directly liable for Defendant Kuzikov's dangerous conduct that caused the crash with the stopped vehicle occupied by Sarah Popovich and Charlotte Fink. Simbad is not only vicariously liable but also directly liable for all harms, losses and other damage caused by the crash.

### THIRD CLAIM
**(Negligence/Negligence *Per Se*/Recklessness - Greatwide)**

91.     Plaintiffs hereby incorporate by reference the preceding paragraphs of this Complaint as if fully recited herein.

92.     Defendant Greatwide is licensed with the US Department of Transportation as a Motor Carrier and operates as an interstate Motor Carrier (DOT 57264-MC277164).

93.     Defendant Greatwide also is registered as a broker.

94.     Defendant Greatwide had no authority or permission from the Shipper to act as a broker for this shipment.

95.     A broker must be identified on the Bill of Lading.  Defendant Greatwide is not identified on the Bill of Lading as the broker for the transportation of this shipment.

96.     Pleading in the alternative, Defendant Greatwide was acting as a broker for the Alton Steel shipment.

97.     Pleading in the alternative, Defendant Greatwide did not have authority or permission from Alton Steel to act as a broker and violated regulations by acting as a broker without being identified as the broker on the Bill of Lading.

98.     The regulatory framework of the FMCSA is intended to achieve the fundamental purpose of maintaining safety and to implement rules and minimum standards for purposes of ensuring safety in Motor Carrier transportation.

99.     When Defendant Greatwide agreed to be the Motor Carrier for Alton Steel's transportation of shipments via the Greatwide Motor Carrier Agreement, Defendant Greatwide warranted and agreed that all of Alton Steel's shipments "shall be carried in compliance with all rules and regulations of the Federal Motor Carrier Safety Administration."  More importantly, Defendant Greatwide also agreed to be "liable as an interstate motor carrier for the safe transportation of all property" from Alton Steel.

100.     An entity like Defendant Greatwide that is engaged in an activity that can only be lawfully carried on by permission granted from a public authority and which involves an unreasonable risk of harm to others, (like the trucking industry), is liable for physical harm

caused by the negligence of others like Defendant Simbad and Defendant Kuzikov who performed the work to carry on the regulated activity.

101.     For the transportation of this shipment and for this crash, Defendant Greatwide arranged for the transportation of a shipment that Defendant Greatwide was authorized to transport and that Defendant Greatwide accepted for transportation and that Defendant Greatwide was legally bound itself to transport.  Therefore, Defendant Greatwide is legally responsible for the conduct of the persons and entity it employed to transport this shipment who and caused the crash.

102.     In the transportation industry, a Shipper, Motor Carrier or Broker must use reasonable care in selecting and/or hiring a Motor Carrier or driver to transport a shipment.  A Shipper, Motor Carrier or Broker is liable for all harm to third parties caused by the failure to exercise reasonable care to employ a competent and careful Motor Carrier or driver to do work that will involve a risk of physical harm if not skillfully and carefully done and/or to perform any duty that the Shipper, Motor Carrier or Broker owes to another party.  Defendant Greatwide negligently and/or recklessly employed Defendant Simbad and Defendant Kuzikov to transport this shipment and is responsible for all damages, harms and losses caused by the crash.

103.     Regardless of the employment, agency or contractual relationship between or among the various Defendants, Defendant Greatwide was contractually, and by regulation, required to direct and control the Alton Steel shipment in accordance with the contract documents as well as State and Federal regulations.  Defendant Greatwide was required as a matter of law to have control of and be responsible for motor vehicles it did not own but used to transport the property for Alton Steel and to ensure the safe operation of the tractor-trailer as if it was owned by Defendant Greatwide.  As a result, Greatwide is legally responsible for the conduct of Simbad and Kuzikov as a matter of law.

104.     When a Motor Carrier or Broker undertakes to render services to another that he should recognize as necessary for the protection of third persons, is subject to liability to third parties for physical harm resulting from the failure to exercise reasonable care when the failure to exercise reasonable care increases the risk of harm; they have undertaken to perform a duty owed by the other to a third party; or the harm is suffered because of reliance by the other or the third person upon the undertaking.  The selection of a safe Motor Carrier and truck driver is required by law and industry standard for the purpose of protecting the motoring public including the Plaintiffs in this case.  Defendant Greatwide failed to use reasonable care in selecting Defendant Simbad and Defendant Kuzikov and that failure to use reasonable care increased the risk of harm in transporting this shipment.  Defendant Greatwide owed a duty to Alton Steel and to the public, including Plaintiffs, to safely transport this shipment.  Third parties like Plaintiffs and Alton Steel were harmed because they relied upon Defendant Greatwide to perform its duty to safely transport this shipment.  Therefore, Defendant Greatwide is liable for the damages, harms and losses caused by this crash.

105.     As a direct and proximate result of Defendant Greatwide's negligence, negligence *per se* and/or reckless conduct, Charlotte Finck suffered significant damage to her personal property, was severely injured, experienced conscious pain and suffering, and later died.  The Estate of Charlotte Finck hereby brings a wrongful death and survivorship claim on behalf of the Estate and all beneficiaries and next of kin for all damages available under the law for those claims.

106.     As a direct and proximate result of Greatwide's negligence, negligence *per se* and/or reckless conduct, Sarah Popovich sustained significant, catastrophic and permanent injuries.  These injuries caused a significant loss of consortium for her husband, Chris Popovich, and their children Wesley and William.

22

107.     Defendant Greatwide's conduct, including its reckless and wanton selection of Defendant Simbad and Defendant Kuzikov as its sub-carrier, demonstrates a reckless disregard for the rights and safety of the motorists of Ohio, including Charlotte Finck and Sarah Popovich. Greatwide's conduct demonstrates malice, aggravated and egregious fraud. Further, Defendant Greatwide knowingly authorized, participated in and ratified conduct, actions and omissions of Defendant Kuzikov and Defendant Simbad.

### FOURTH CLAIM
### (Loss of Consortium – Charles, Wesley and William Popovich – Against All Defendants)

108.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if fully recited herein.

109.     At the time of the crash, Plaintiff Charles Popovich, was and remains the lawful husband of Plaintiff Sarah Popovich and the two were living together as husband and wife.

110.     At the time of the crash, Plaintiff Wesley Popovich, was and remains the minor son of Plaintiffs Sarah and Charles Popovich, and was living with and being cared for by Sarah Popovich at the time of the crash.

111.     At the time of the crash, Plaintiff William Popovich, was and remains the minor son of Plaintiff Sarah and Charles Popovich and was living with and being cared for by Sarah Popovich at the time of the crash.

112.     As a direct and proximate result of the acts, omissions and/or reckless conduct of all the Defendants and the severe and permanent injuries suffered by Sarah Popovich, Plaintiff Charles Popovich, Wesley Popovich and William Popovich have sustained a loss of consortium of their wife and mother, and are entitled to full compensation for their loss in an amount determined at trial.

113.     The loss of consortium and damages arising therefrom is continuing in nature.

23

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against all Defendants, jointly and severally, as follows:

1. Just and fair compensation far in excess of $25,000 for each Plaintiff on each claim;

2. Punitive damages and attorney fees;

3. Costs and expenses;

4. Prejudgment and post-judgment interest; and

5. Any other relief this Court deems just and equitable.

Respectfully submitted,

| | |
|---|---|
| */s/Daniel R. Mordarski* | */s/Ashley Rutherford Starling* |
| Daniel R. Mordarski (0063228) | Asley Rutherford Starling (0084009) |
| LAW OFFICES OF | Jason E. Starling (0082619) |
| DANIEL R. MORDARSKI LLC | WILLIS SPANGLER STARLING |
| 5 East Long Street, Suite 1100 | 4635 Trueman Boulevard, Suite 200 |
| Columbus, Ohio 43215 | Hilliard, Ohio 43026 |
| (614) 221-3200 – Telephone | (614) 586-7900 – Telephone |
| (614) 221-3201 – Facsimile | (614) 586-7901 – Facsimile |
| dan@mordarskilaw.com | astarling@willisattorneys.com |
| *Attorney for Stephen Moyer, Esq.* | jstarling@willisattorneys.com |
| *Administrator of the Estate of Charlotte J.* | *Attorneys for Plaintiffs* |
| *Finck* | *Sarah, Charles, Wesley & William Popovich* |

## JURY DEMAND

Plaintiff hereby demands a trial by a jury of eight (8) persons on all issues triable under the law.

*/s/Daniel R. Mordarski*
Daniel R. Mordarski (0063228)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on August 18, 2020, a true copy of the foregoing First Amended Complaint was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. A courtesy copy was sent by email to counsel for Simbad and Kuzikov at:

Jessica Reese, Esq.
DICKIE MCCAMEY
250 Civic Center Dr., Suite 280
Columbus, OH 43215
jreese@dmclaw.com
*Attorney for Defendants*

A copy a Summons and the foregoing First Amended Complaint shall also be served by the Clerk via Certified Mail upon:

GREATWIDE DALLAS MAVIS LLC
c/o CT Corporation System Philadelphia
2001 Market Street, 5th Fl.
Philadelphia, PA 19103
*Defendant*

*/s/Daniel R. Mordarski*
Daniel R. Mordarski (0063228)

## CONTRACT CARRIER TRANSPORTATION SERVICE AGREEMENT

This agreement is entered into as of the date last signed below by and between

Greatwide Dallas Mavis LLC

hereinafter called the "CARRIER", and ALTON STEEL INC., hereinafter called the "SHIPPER".

WHEREAS, SHIPPER desires to engage the services of CARRIER for the transportation of goods, products and merchandise of SHIPPER in interstate commerce and CARRIER desire to perform such service for SHIPPER:

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, it is hereby agreed as follows:

1. CARRIER warrants that all commodities carried pursuant to this agreement shall be carried in compliance with all rules and regulations of the Federal Motor Carrier Safety Administration, Department of Transportation, Environmental Protection Agency and any other relevant statutes and regulations, federal, state, or local, as are now in effect or may be enacted or promulgated from time to time during the term of this agreement. CARRIER further agrees to indemnify and hold SHIPPER harmless from any third-party claims of liability or damage to the extent caused by CARRIER's failure to comply with any statute or regulation. CARRIER's defense, indemnification, and hold harmless obligations in this agreement shall not apply to the extent the claim is caused by the negligence or otherwise wrongful acts or omissions of SHIPPER. SHIPPER shall have the right at its discretion to demand proof of such compliance, which CARRIER agrees to satisfy within ten (10) days of SHIPPER'S written demand.

2. CARRIER shall transport SHIPPER'S commodities at the rates and pursuant to the rules prescribed and set forth in the schedule of rates (with a copy attached hereto Exhibit A) and as subsequently amended or modified by any supplements, reissues or addenda.

3. CARRIER will at all times maintain adequate insurance for public liability, property damage liability, and cargo loss/damage in the performance of this agreement. Carrier shall furnish SHIPPER current certificates evidencing valid insurance coverage at all times during the pendency of this agreement.

4. CARRIER shall be liable as an interstate motor carrier for the safe transportation of all property placed in the care, custody, or control of CARRIER, provided, that CARRIER shall not be liable for loss, damage, or injury resulting from war, strikes, Act of God or a public enemy, an act of SHIPPER, or for any other reason beyond the control of the CARRIER. Carrier's liability for cargo under its control shall be that of a motor carrier under 49 D.S.C. § 14706 (Carmack Amendment) and cases promulgated thereunder. However, Carrier will only be responsible for wet damage claims if the fault of Carrier is solely responsible for the loss or damage. All claims for cargo loss or damage shall be processed in accordance with the provisions of 49 C.F.R. 370. All claims for loss or damage to cargo will be resolved based on the lesser of the wholesale value or the manufactured cost of the material in question at the time of Carrier's receipt of the shipment. Carrier's maximum liability for cargo loss or damage per conveyance is $100,000. Claims for cargo loss or damage must be filed with Carrier within 9 months of the date of loss or

EXHIBIT A

damage. Actions at law regarding cargo claims for loss or damage must be filed no later than 2 years after the date Carrier provides written notice of the disallowance of all or part of a claim. The failure to adhere to the foregoing time limitations shall forever bar the claim or action.

5. CARRIER agrees to defend, indemnify and save SHIPPER harmless from and against any and all claims for workmen's compensation benefits, as well as all contributions, including taxes, for unemployment insurance, social security, old age benefits, etc., required in the performance by CARRIER of this agreement concerning CARRIER's employees.

6. Carrier shall be free from all direction and control of SHIPPER. CARRIER shall be an independent contractor and nothing herein shall be construed to be in inconsistent with such status.

7. CARRIER agrees to attempt to meet the special needs of SHIPPER by providing it with a complete transportation service that is both flexible and reliable. CARRIER agrees to provide service as necessary to meet the changing character of SHIPPER'S transportation requirements, including changes in marketing area, types of commodities handled, or locations of facilities. CARRIER agrees to adjust its operations and/or rates and charges as necessary to meet the changing transportation need of SHIPPER.

8. SHIPPER shall make reasonable efforts to keep CARRIER advised of equipment required by SHIPPER and SHIPPER shall tender to CARRIER for transportation, in a series of shipments, at least five (5) truckloads per year throughout the duration of this contract.

9. This agreement may be terminated by either party by giving the other party ten (10) days written notification, but unless so terminated, this agreement shall remain in effect for the period of one (1) year from the date of execution hereof, and will automatically renew itself on a year-to-year basis.

10. Notwithstanding any other provision herein, the failure of either party to perform its obligations under this agreement, other than payment of amounts invoiced, shall not subject the nonperforming party to liability (including, without limitation, loss or damage to cargo) or a breach if such failure is caused by any event of force majeure, including without limitation acts of God or the public enemy, fire, flood, labor disorder, civil commotion, closing of the public highways, government interference, regulations, or other contingencies beyond the reasonable control of the nonperforming party.

11. Shipper shall pay Carrier's invoices within thirty (30) days of presentment by Carrier. Payments made after the thirty (30) day credit period shall be assessed a service charge of one percent (1) on the outstanding freight charge balance for each thirty (30) days, or part thereof, that the freight charges remain unpaid.

12. If the parties are unable to resolve any dispute between them concerning this Agreement, the matter shall be submitted to arbitration for resolution, at a mutually agreeable location. The rules of commercial arbitration of the American Arbitration Association in effect on the date the matter is submitted to arbitration shall apply.

The parties submit that the performance of this contract will not affect the quality of the human environment within the meaning of the National Environmental Policy Act.

IN WITNESS WHEREOF this agreement has been duly executed by the parties hereto as of the day and
year written below.

Greatwide Dallas Mavis LLC

By: _~~signature~~_

Printed name: Kelly A. McDowell

Title: Paralegal

Date: August 8, 2018

Alton Steel, Inc.
#5 Cut Street
Alton, IL 62002

By:

Printed name:

Title:

Date:

Case 2:20-cv-05405-ACA-ERB Doc #: 1-29 Filed: 04/24/20 Page 29 of 34 PAGEID #: 308

0F213 **STRAIGHT BILL OF LADING—SHORT FORM-ORIGINAL-NOT NEGOTIABLE**

| Name of Carrier | Customer PO NO | Date | Customer NO | Shipper's No |
|---|---|---|---|---|
| Greatwide | 30209-2 | 03/25/19 | 506 | 145595 |

RECEIVED, subject to the classification and lawfully filed tariffs in effect on the date of issue of this Bill of Lading.

The property described below in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined as indicated below which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry to its usual place of delivery at said destination, if on its route, otherwise to deliver to another carrier on the route to said destination. It is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in Uniform Freight Classifications in effect on the date hereof, if this is a rail of rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment.

Shipper hereby certifies that he is familiar with all the terms and conditions of the said bill of lading, set forth in the classification or tariff which governs the transportation of this shipment,

| From | | Shipped To/Consignee | The Dyson Corporation |
|---|---|---|---|
| Shipper | Alton Steel, Inc | | 53 Freedom Road |
| Origin | #5 Cut Street | | |
| | Alton, IL 62002 | | Painesville, OH 44077 |

| Route and Delivering Carrier | Collect/Prepaid:  Prepaid |
|---|---|
| Greatwide | |

| Customer Ord NO / Line NO | +HM | Item NO / Description<br>Heat NO / Quantity | Length | Weight Subject To | Class or Rate | X | Charges Carrier Use Only |
|---|---|---|---|---|---|---|---|
| PO NO: 30209-2 | | | | | | | |
| 93927 / 1 | | 0102.5000-1045 | 32' 0 " | | N - | | 45,420 |
| Part No | | Steel Bar, Hot Rolled, 2.5000 | 45,420 | | T - | | |
| 02.500-HR-RND-CA-A576-1 1045 | | | | | G - | | 45,420 |
| | | **Heat 188871** | | | | | |
| | | 642X188871-038 | 6,490 (12 pieces) | | | | |
| | | 642X188871-042 | 6,480 (12 pieces) | | | | |
| | | 642X188871-043 | 6,480 (12 pieces) | | | | |
| | | 642X188871-045 | 6,490 (12 pieces) | | | | |
| | | 642X188871-046 | 6,490 (12 pieces) | | | | |
| | | 642X188871-047 | 6,500 (12 pieces) | | | | |
| | | 642X188871-048 | 6,490 (12 pieces) | | | | |

*Piece Counts are estimates based on a calculation*

Page 1 of 1

| Sold To | The Dyson Corporation | Additional Comments |
|---|---|---|
| | 53 Freedom Road | |
| | Painesville, OH 44077 | |

| *If the shipment moves between two ports by a carrier by water, the law requires that the bill of lading shall state whether it is "carrier's or shipper's weight."<br><br>Shipper's imprint in lieu of stamp: not a part of bill of lading approved by the | NOTE: Where the rate is dependent on value, shippers are required to state specifically in writing the agreed or declared value of the property.<br>The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding:<br><br>$          per | Subject to Section 7 of conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:<br>The carrier shall not make delivery of this shipment without<br><br>(Signature of Consignor) | TOTAL<br>CHARGES S |
|---|---|---|---|

"This is to certify that the named materials are properly classified, described, packaged, marked, labeled, and are in proper condition for transportation, according to the regulations of the Department of Transportation."

| SHIPPER | CARRIER | DATE |
|---|---|---|
| PER | PER | 3/25/2019 |

* Mark with "X" or "RQ" if appropriate to designate Hazardous Materials or Hazardous Substances as defined in the Department of Transportation Regulations governing the transportation of hazardous materials. The use of this column is an optional method for identifying hazardous materials on bills of lading per Section 172.201(a)(1)(iii) of Title 490 Code of Federal Regulations. Also, when shipping hazardous materials, the shipper's certification statement prescribed in Section

**EXHIBIT B**



An official website of the United States government
Here's how you know

THE UNITED STATES
DEPARTMENT *of* JUSTICE
STICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                      Friday, December 23, 2011

## Pennsylvania Husband and Wife Sentenced to Prison for Fraudulent Commercial Driver's Licenses Scheme

WASHINGTON – A Pennsylvania husband and wife were sentenced yesterday to 30 months and 24 months in prison, respectively, for their participation in a scheme to provide out-of-state residents with Pennsylvania driver's licenses and Pennsylvania commercial driver's licenses (CDL), Assistant Attorney General Lanny A. Breuer of the Justice Department's Criminal Division and U.S. Attorney Zane David Memeger of the Eastern District of Pennsylvania announced today.

Vitaliy Kroshnev, 49, and his wife Tatyana, 46, of Richboro, Penn., were sentenced by U.S. District Judge Norma L. Shapiro. In addition to the prison terms, Judge Shapiro ordered three years of supervised release for each defendant and a forfeiture money judgment of $445,450.

Vitaliy and Tatyana Kroshnev owned and operated the International Training Academy (ITA). From 2007 to 2010, they arranged for hundreds of non-residents of Pennsylvania to fraudulently obtain Pennsylvania commercial driver's licenses through the ITA. The Kroshnevs paid other members of the conspiracy, who lived in Pennsylvania, to allow out-of-state ITA clients to use the in-state home addresses as proof of Pennsylvania residency. They also employed corrupt translators to ensure Russian-speaking applicants passed the written portion of the CDL test, regardless of the applicants' actual knowledge.

The couple pleaded guilty to conspiracy to produce and aiding and abetting the production of an identification document without lawful authority. Vitaliy Kroshnev also pleaded guilty to making a material false statement and conspiracy to commit immigration fraud.

The case was investigated by the FBI and the U.S. Department of Transportation Office of Inspector General. The case was prosecuted by Assistant U.S. Attorneys Frank Labor and Michelle Morgan of the Eastern District of Pennsylvania and Trial Attorney Margaret Vierbuchen of the Organized Crime and Gang Section in the Justice Department's Criminal Division.

**Component(s):**
Criminal Division

**Press Release Number:**
11-1708

*Updated September 15, 2014*

**EXHIBIT C**

United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

# MIDDLE DISTRICT of FLORIDA

**Department of Justice**

U.S. Attorney's Office

Middle District of Florida

FOR IMMEDIATE RELEASE           Monday, July 6, 2015

## Illegal Commercial Driver License Conspiracy Exposed

Orlando, Florida – United States Attorney A. Lee Bentley, III announces the return of an indictment charging Ellariy Medvednik (48, Oviedo), Natalia Dontsova (49, Oviedo), Adrian Salari (44, Orlando), and Clarence Davis (76, Winter Garden) with conspiracy to aid and abet the unlawful production of Florida driver licenses and commercial driver licenses ("CDLs"). If convicted on all counts, each defendant faces a maximum penalty of 30 years in federal prison.

According to the indictment, Medvednik, Dontsova, and Salari were affiliated with Larex, Inc., a commercial truck driving school. Larex marketed itself to Russian speakers online. Individuals residing out-of-state seeking Florida CDLs would contact Medvednik to arrange for Larex's services at the cost of approximately $2,000. Those individuals would then travel to Florida to obtain their CDLs with the intention of returning to their home states immediately afterward. However, to obtain a Florida CDL, an individual must first possess a Florida driver license. The State of Florida restricts its driver licenses and CDLs to Florida residents. Medvednik, Dontsova, and Salari conspired to provide false documentation that the individuals resided with them, so that the individuals could obtain Florida driver licenses.

After providing the false residency certifications, Larex assisted the students with the additional requirements for obtaining a CDL. First, Dontsova, using covert communication equipment, provided answers to the students during the written portion of the CDL exam, the successful completion of which led to the issuance of a commercial learner's permit. Second, Larex hired Davis, a third-party tester authorized by the State of Florida, to administer vehicle inspection tests, basic control skills tests, and road tests. Davis routinely passed and certified students who should have failed based on their test performance. As a result of Davis's certifications, the individuals were able to obtain Florida CDLs. In return, Davis received from Medvednik approximately $75 per student above his posted rate. At least 600 individuals have been identified as utilizing Larex's services with Davis as the third-party tester.

An indictment is merely a formal charge that a defendant has committed one or more violations of federal criminal law, and every defendant is presumed innocent unless, and until, proven guilty.

This case was investigated by the U.S. Department of Transportation's Office of Inspector General, the Federal Bureau of Investigation, U.S. Immigration and Customs Enforcement's Homeland Security Investigations, and the Florida Highway Patrol. It will be prosecuted by Assistant United States Attorney Embry J. Kidd.

**Component(s):**

USAO - Florida, Middle

Updated July 6, 2015

ⓘ The latest general information on the Coronavirus Disease 2019 (COVID-19) is available on Coronavirus.gov.



**Office of Inspector General | U.S. Department of Transportation**
Howard R. "Skip" Elliott, Acting Inspector General

# Investigations

May 10, 2018

## New York Commercial Truck Driver Pleads Guilty To Participating in a CDL Testing Fraud Scheme in Florida and New York

On May 10, 2018, Aziz Akhrorov, a truck driver based in Queens, New York, pleaded guilty in U.S. District Court, Brooklyn, New York, to conspiring to unlawfully produce commercial driver's licenses (CDL). Akhrorov was indicted on January 20, 2017.

To prevent or reduce truck and bus accidents, fatalities, and injuries, DOT regulations require States to test the knowledge and skills of all CDL applicants. Between April 2014 and December 2016, Akhrorov and Taras Chabanovych, a co-conspirator in Florida, undermined the CDL testing procedures proctored by the Florida Department of Highway Safety and Motor Vehicles. Their scheme caused genuine Florida CDLs and photo IDs to be issued to New York-based applicants, who later exchanged the fraudulently obtained licenses for CDLs from the State of New York.

Akhrorov recruited New York-based CDL applicants, usually of Russian descent, and referred them to Chabanovych. For as much as $2,600 per referral, Chabanovych helped the applicants fraudulently obtain documentation that established bogus Florida residency so they could sit for the exam. He also provided sophisticated video and audio devices, which were concealed on the applicants and transmitted the CDL test to Chabanovych, offsite. Chabanovych supplied the CDL applicants, who were wearing earpieces, with the correct answers to the test.

Chabanovych pleaded guilty on May 24, 2017, to the aforementioned indictment and is awaiting sentencing.

DOT-OIG is conducting this investigation with the Department of Homeland Security (DHS) Homeland Security Investigations (HSI).

**EXHIBIT E**

## Related Library Items

**12.04.2018**   New York Truck Driver Sentenced for His Role in CDL-Testing Fraud Scheme (/library-item/36954)